JESSE C. McGEE, Judge ad hoc.
This is a workmen’s compensation suit by Clara Nola Hinyup, as claimant, against her employer, L. A. Frey & Sons, Inc., and its workmen’s compensation insurer, Liberty Mutual Insurance Company; she claims compensation for permanent total disability *512 resulting from an alleged injury sustained by her on August 6, 1958. The defendants deny that the claimant sustained any injury during the course of her employment, and further deny that she was at any time subsequent to August 6, 1958, disabled from working.
After trial the court found for the claimant and awarded her compensation at the rate of $35.00 per week for a period of 100 weeks commencing from August 6, 1958, together with the sum of $635.48 representing medical and doctor expenses.
It is from this judgment that the defendants have perfected their appeal and the plaintiff has answered the appeal and prays that the judgment be amended by increasing the amount of the award to 400 weeks at $35.00 per week with interest at the rate of 5% per annum from due date of each installment until paid together with statutory penalty of 12% per annum, plus reasonable attorneys fees.
In this court defendants have moved to dismiss or strike plaintiff’s answer to the appeal on the grounds that the answer was not timely filed in accordance with the provisions of LSA-C.C.P. Art. 2133 which requires that an answer to an appeal must be filed not later than fifteen days after the return day or the lodging of the record, whichever is later. Defendants contend that since the record in this case was lodged on March 2, 1961 and plaintiff’s answer to the appeal was not filed until March 31, 1962 that the answer was not timely filed. In answer to this contention plaintiff argues that LSA-C.C.P. Art. 2133 is not applicable but that instead Code of Practice, Art. 890 is controlling here.
The record shows that the order for this suspensive appeal was signed by the trial judge July 1, 1960, fixing the return day on July 29, 1960. Plaintiff was served with a copy of this order. Subsequently each month the defendants obtained an extension of the return day for the reason that the court reporter had not completed the transcript of testimony until finally on February 27, 1961, the return day was extended to March 27, 1961. However, the plaintiff did not receive notice of these extensions of the return day. Furthermore, the record does not show that plaintiff received any notice when the record was lodged in the Court of Appeal on March 2, 1961.
Under these facts the plaintiff contends that insofar as she was aware, the record was lodged on July 29, 1960, the return date indicated in the only notice which she received. Plaintiff argues that if the record had been lodged on July 29, 1960, as she had a right to assume that it did, the delay for answering the appeal would have started to run at that time and under the provisions of Code of Practice, Art. 890 would have continued until three days before that fixed for argument, which date in this case was July 9, 1962.
Applicable here is Sec. 4 of Act 15 of 1960, the enabling act for the LSA-Code of Civil Procedure, found in LSA-C.C.P. page 748, reading in pertinent part as follows:
“Section 4. (A) This act is hereby declared to be remedial legislation.
“(B) The provisions of the Louisiana Code of Civil Procedure enacted by Section 1 hereof, so far as applicable, shall govern and regulate the procedure in all civil actions and proceedings :
“(1) Instituted on or after the effective date of this act; and
“(2) Pending on the effective date of this act, except that none of the provisions thereof shall:
“(a) Decrease or shorten any procedural delay granted or allowed by any law in existence immediately prior to, and which had commenced to run but had not yet completely elapsed on, the effective date of this act; or”
In our opinion the exception set forth in Section 4(B) (2) (a) is applicable here be *513 cause an application of LSA-C.C.P. Art. 2133 would shorten a delay which had commenced hut not yet elapsed. Insofar as the plaintiff was notified or is shown to have known, the record was lodged in the Court of Appeal on July 29, 1960, on which date Code of Practice, Art. 890 was in effect providing that the procedural delay for answering the appeal would extend until three days before the case was set for oral argument. It would he harsh indeed to hold that the plaintiff did not have a right to rely on the provisions of Code of Practice, Art. 890 when she received no notice of the extensions of the return dates nor any notice of the date the appeal was lodged.
The case of Great American Indemnity Co. v. Wilson, 140 So.2d 477 (1st Cir. La.App.1962), cited by defendants is clearly distinguishable. In these cases the orders for appeals were signed in the district court on May 1, 1961 and May 5, 1961, the records were lodged in the Court of Appeal on June 5, 1961, and the answers to the appeals were not filed until September 23, 1961. The appellee contended that since suit was filed before January 1, 1961, the provisions of Code of Practice, Art. 890 were controlling. The court held that since the orders for the appeals were signed and the records lodged after January 1, 1961, the provisions of LSA-C.C.P. Art. 2133 were controlling and that the answers to the appeals were not filed within fifteen days is required. The factual distinction between that case and the instant case is that here the order for an appeal was signed before January 1,1961 and insofar as the appellee knew, the record was lodged before January 1, 1961. We agree with Great American Indemnity Co. v. Wilson, supra, but find it inapplicable here.
We are of the opinion that the answer to the appeal in this case was timely filed and that defendants’ motion to dismiss said answer must be overruled.
The plaintiff alleges that on or about August 6, 1958, while in the employment of L. A. Frey & Sons, Inc., and in the course and scope of her duties as a sausage machine operator, she slipped on ice on the floor, fell and suffered a serious injury to her back; that as a result of the fall or injury she suffered a strain to the' nerves and muscles of her back in the sacroiliac area and suffers pain in the sacral area with radiation down into her legs; she has received examination and treatment and bilateral traction for a period of 14 days, and thereafter underwent a lumbar myelogram in order to determine if there was evidence of detectable compression of the sacroiliac and sciatic nerve root, but no relief has been obtained from this condition; that she continues to wear a lumbo-sacral corset and elastic bandages to halt the swelling and pain in the lower extremities.
Plaintiff testified that after the accident, she left the plant, caught a bus and met her husband at a ferry boat in Gretna, after having called him; that she went to the office of Dr. Ernest A. Schiro for treatment; that on the following, morning she returned to the plant and furnished one of the officials, Lawrence Frey, with a note from Schiro, wherein the doctor suggested that she have a leave of absence from her job.
The defendants argue that there are a number of matters which attack the plaintiff’s credibility; that she denied 'she' quit work for any reason other than that she sustained a back injury on August 6, 1958; she denied that she had for several months prior to that time made plans to retire and move with her husband* who was also retiring, to their home in Mississippi; she denied any illnesses which were her reason for retirement; she denied that her retirement was planned prior to the time of her accident upon the advice of her personal physician, and finally, she denied having had a discussion with. Dr. Sanchez on August 5, 1958, the day before she quit work for Frey because of her various physical difficulties. (Tr. 103-119-125)
The defendant further states that the plaintiff consulted Dr. Sanchez, the company physician, on numerous occasions *514 since 1955, and bis testimony discloses that as company physician he has had numerous .occasions to be consulted by Mrs. Hinyup. From his records he has shown the date of these consultations up to and including August. 5, 1958, the day before the alleged accident, he testified as follows :
“Q. Now when did you again see Mrs, Hinyup ?
“A. The next visit and the last visit from Mrs. Hinyup was on August 5, 1958. She came in complaining of having some weak spells during the previous weeks and feeling quite uncomfortable at work. She stated that at that time she wished to consult her private physician, Dr. Schiro and she was referred to Dr. Schiro for future treatment; and then we discussed at that particular visit whether she should continue work or not, and she said that she didn’t know whether she should continue work on the basis of her discomforts, and that she would seek Dr. Schiro’s advice in that regard.” (Tr. 221)
Now on cross examination Dr. Sanchez testified:
“Q. Now, when you examined Mrs. Hinyup on August 5, and I take it you did examine her on August 5.
“A. Yes sir.
“Q. You found no evidence of a . back strain, did you?
“A. No, sir.
"Q. So that his diagnosis of Dr. Schiro was completely different from any diagnosis that you had made on August 5th?
“A. That’s correct, I had made no diagnosis on August 5th.
“Q. You found nothing to diagnosis?
“A. That’s correct, a physical examination was essentially negative, and her concern with weak spells primarily was the reason for her wishing to consult him as a private physician, to which I of course agreed, as I usually do.” (Tr. 226)
Dr. Schiro, the plaintiff’s private physician, testified that Mrs. Hinyup came to him and stated that while working at Frey she slipped and hurt her back. She was complaining of pain over the low back area and had restricted motion of the back on forward bending. Those were my findings. I gave her a note to her boss for six weeks rest. My diagnosis was lumbo-sacral strain, and on a strain of that type we usually advise six weeks off; that diagnosis was contained in the note. The doctor further testified that he had a copy of the note; that there were several notes and some of them have been misplaced; this note dated August 7, 1958, and was given to Mrs. Hinyup to take to her employer. He further stated that she was seen by him again on August 19, ’58, for low back pain. She stated she slipped while at work and examination revealed tenderness over the lumbo-sacral spine and limited restriction. Straight leg raising was negative. Diagnosis, lumbo-sacral strain. Bed rest and no work for six weeks. (Tr. 138) The doctor further stated that he saw Mrs. Hinyup on September 8, ’58, and she still complained of the same pain over the lower back and since there was no improvement she was referred to Dr. Brown for a consultation. (Tr. 139)
Dr. G. Gernon Brown, Jr., testified that he examined Mrs. Hinyup, at the request of Dr. Schiro, on September 24, 1958, and that Mrs. Hinyup complained of some discomfort in the sacral area of the spine on bending forward. There was no spasm of the muscles or scoliosis, which means a curvature of the spine, or pelvis tilt, which is a condition when one side of the pelvis is higher than the other. She complained of some discomfort on pressure in the lumbo-sacral area. The doctor further stated that the examination of the patient in the prone position revealed a complete range of motion of both hips and knees. There was no *515 atrophy of the muscles of either of the lower extremities. Straight leg raising which is a test in which the leg is raised up straight, was possible to about 75 degrees bilaterally, in both lower extremities. This examination of the patient was in the supine position, I should have said in my report. Examination in the prone position, that is face down, revealed pain on pressure in the lumbo-sacral area, the low back area. There was no spasm of the muscles. X-Rays taken at the Larocca Hospital were reviewed and showed no evidence of fracture or dislocation. The doctor further stated that it was his opinion that the patient presented evidence of a strain from which he felt she was recovering satisfactorily and that she could return to her former occupation, as he did not believe that she was disabled. The doctor further testified that he again saw Mrs. Hinyup in October, 1958, when she gave him a history of her injury and she still complained of discomfort in her back; at that time he found that she had a satisfactory range of motion and no deformity, and that she was instructed, that as his opinion, the discomfort of which she complained was transitory and would pass and she could return to her former occupation. The doctor further stated that after his original examination he prescribed a lumbo-sacral support, a corset which supports the low back area. (Tr. 147-148)
The doctor stated that Mrs. Hinyup had told him on the first examination that she had slipped and fallen hurting her back. She said she fell about a month before, having slipped on some ice; that she also told him she was examined by Dr. Sanchez and treated with some heat and medication; that her back was still painful and she hadn’t worked since August 16th. Then the doctor, after an examination of his notes, stated his record says August 6th. The doctor further stated that the injury he found and for which he prescribed was consistent with a fall. (Tr. 148-149)
Sometime after October, 1958, the Hiny-ups moved to Mississippi. Mr. Hinyup having retired due to ill health. Mrs. Hinyup placed herself under the care of Dr. Hubert Fulton Campbell, a general practitioner, Wiggins, Mississippi, and the doctor’s testimony is in the record.
Dr. Hubert Fulton Campbell, Wiggins, Mississippi, testified by deposition made on the 11th of June, 1960, that he first saw Mrs. Clara Hinyup in December of ’58, and at that meeting he took her history but no physical was done on her. In the history she gave him she stated that she had fallen at work and had received an injury to her back and had considerable pain since then, having been incapacitated to a point to where she could hardly get around. The doctor firrther stated after taking this history he suggested she contact Dr. Attix in Hattiesburg, Mississippi, for an orthopedic work-up; that after Dr. Attix had seen her, Dr. Attix suggested that she be put in the hospital and put in traction for approximately seven days and if she didn’t show improvement a myelogram should be performed. Dr. Campbell further stated that during the period she was in traction that she was relieved of her symptoms but after removing the traction her symptoms returned, and suggested that she return to Dr. Attix for a myelogram and further studies. The doctor further stated after the myelo-gram she returned periodically through the year of 1959, and up to the present date and that she continually complained of pain in the lower part of her back and in the lower extremities, edema of the lower extremities and considerable incapacitation from the said pain; that she had been put to bed and every known treatment has been tried and she still continued to have trouble and that he, over a period of time, has made from five to six examinations; from these examinations he found in the lower part of the extrémities, some swelling in the ankles, and also noted some considerable spasms of the back muscles, including the sacroiliac and the lumbar area. This, with the swelling and spasm, was all he found. The doctor stated in the way of treatment she has been given, over a period of time, muscular relaxing drugs of every form that *516 be knows of; she,has been .put on a hard bed for a period of time; heat has been applied.to,the area of, trouble; and while this has been..going on she .has,-received, relief, but any type of work or exercise seems to re-occur the trouble. He stated that he last saw the patient in April of this year (I960)' and at that time she was havL mg' some trouble with her heart and also some' trouble with her back. In response to' the question if she was able to do ■ any kind of work;-the'doctor replied that having treated this lady over a period of fifteen months,' he would state from a'physical standpoint that she won’t do it — -psychologically and physically — , because she-is afraid of it, 'and I think it would refer back to her old state where shé would be having considerable'pain' and be back in the state of spasm and muscle pain and so on. (Tr.' 33-37) ' ’
■ The "deposition of Dr. Edward A. Attix taken in' Hattiesburg-, • Mississippi, on the 21st day of May, 1960, the doctor specializing in the fiéld of' orthopedic surgery. He testified that-he first saw Mrs. Clara Hinyup on December 22,-1958, and saw her again on January 27, 1959, when she- was admitted to the hospital- in: Hattiesburg, and when she wás discharged from the hospital on' February I, 1959.! ■' The- doctor stated that on December 22, 1958, "she was referred to-his office • by Dr.’■ Campbell"of ■ Wiggins.- She'was a 48 year old white female who stated that -in November, = 1959,. she 'had slipped while at work for'Frey Bros. Packing House in New Orleans, and-sustained-an injury to her-back. She received treatment1 for that’ condition by the company doctor and did not ttiiss any work’; that she was injured again on August 6, 1958, :at 'approximately' 11:00 A.-M. 'The injury occurred■ while she was wórking; and slipped- on some icé while she was cárrying some -sausage -casing to the frfeezer: at-the plant.: She--stated"that she. felLto.the.floordandirig on her right buttock. She:went'kome,;thatday-and from that-day until:!,-first saw-herí she said she has been under .;thq...par,e( of doctors in. New Orleans with .painful-syrnptoms.in. her.lrinib.a-r, area and with.some radiation to the right lower extremities. She was fitted with a lumbar-sacr.al. brace, but that she had been unable to work since her accident in August, 1958. She had never been hospitalized. She-states that she got good relief from her pain by lying down;,but with any. movement or .ex-, ercise the pain, radiated in the right buttock and down the.posterior, aspect of the thigh.
The doctor further testified that he observed the patient moving about the examining room and she appeared to' have some difficulties although she was not in any sérious distress 'and that he noted some tenderness in the midliné of the level of the lumbo-Sacral joint and that was the’ área where she localized her most serious' and painful symptoms. There was no significant spasm of the muscles. ‘ All motion of the lumbar spine was performed cautiously and appeared to be' slightly limited. The reflexes in the lower extremities were equalized but the patient complained of á sensory deficit over the lateral aspect of her right leg below the knee.' The traction signs of sciatic nerve'root"compression bn the right side were somewhat suggestive. X-Rays of her' íumbáf-spi'ne failed to reveal ariy evidence of fracture. There was what appeared to be some questionable narrowing of the lumbb-sacral intervertebral'disc space. (Tr. 22-25) "
The doctor made a test for this sensory deficit above mentioned with a camel’s hair brush and with a small, pin, and from these examinations she stated that there was some sensory loss. on the lateral aspect on the right leg below the knee; that he felt he could not make a specific anatomical diagnosis, but that the signs were somewhat suggestive .of compression of the right sciatic nerve. roots? and suggested that she be hospitalized and.be. given a trial in bilateral buck’s traction for. a period of ten to fourteen days, (Tr. 25)
The doctor státed that hé rieit saw the patient-on January =27,- , 1959, and conducted an. examination. ;of .her at, that time.-, She. stated to'him ¡that she had bperj: in traction; *517 but had not noted any improvement in her painful symptoms. On examination she still complained of some tenderness in the lumbo-sacral area and pain with movement in the lumbar-spine. The reflexes were again equal but there was. some suggestion of sensory deficit on the lateral aspect of the left leg. The traction signs of sciatic nerve root compression, on both sides, were somewhat suggestive. On my suggestion she was admitted to the hospital on January 27, so that I might perform a lumbar myelogram in an attempt to get a little more information about whether she did actually have sciatic nerve root compression or whether the suggestion of sciatic nerve root was a misleading one. The myelogram was performed on January 29, 1959, and failed to reveal any evidence of compression of the nerve roots or dural sac. The doctor fur-, ther testified he saw the patient at a later date, the time he was not sure of, while in Wiggins about another matter, and gave her a quick examination to see if there had been' any change in these signs, and his recollec-' tion was that there had not been any significant change of these findings.. .Therdoctor; further stated that she complained of swelling in the lower extremities when , she was discharged from the hospital on January 31; he further said he had no explanation for this, but such an occurrence is not unusual in women, particularly, yjdien they, have borne children. The doctor further stated that he was unable tb find an • anatomical basis or diagnosis for the symptoms that-were observed. (Tr. 25-27) ~ .
Mr. Thomas E. Hinyup,,.the. husband’ of-the plaintiff, testified that he met his wife at the ferry in Gretna about' Ü :Ó0 or 11:30 A.M. on August 6th ’; that he, took her to see Dr. Schiro and after leaving the doctor’s’ office they went home; that he "saw she wás in pain and crying and she stayed in bed; the next day hé'Wenit with her'to take a’ paper from Schiro .to her-boss and. he. waited for her-.while she-was at the- office;- that, his wife couldn’t do anything and -was -help-, less around the house and thát.-whén- she gets in the-bath tub he:has:tp.help-her',out; she is continually, in .pain,(Tr. 154-^157) -. ■
Mr. Lawrence S. Frey, an' officer of the defendant corporation, testified that on the 6th, 7th or 8th Mrs. Hmyhp came iñtd> Bis office around mid'day,''just pnof'tó íúrich time, and statéd thht she', would' Íihré"to táké1 three months leave’ of absence oh ’the advice of her doctor and he‘asked her5 whether 'or not she had discussed the matter with'Lewis Frey, the superintendent, and she.,.said, she had. He then told her he would' grant "her the three months (leave, ,'and 'á's*,she was-, leaving Ije gave her a group claim form so. she could check her" weekly benefits while away, explaining that under the group plan the employees get a benefit of $20.00’ a week fo'r’a period’ióf ’13 weeks or so. (Tr.>196~ 199) . j-; : -,. ■;s.
, From the foregoing it appears .that Mrs-. Hinyup did suffer ari accident and reported it to her employer; and that she has had pain'from-the date of the accident'-up to and incltidihg1 the daté’of the--trial :-'H6weve'r; defendants argue that- pláifftiff hasffaile'd to prove her disability, as-a;.res.ultsp.f.the alleged accident, nor any disability subsequent to August 6, 1958, notwithstanding the testimony of Dr. Schiro, Dr. Brown, Dr. Campbell and Dr. Attix.. C»
As to the notice of the accident, the evidence convinced the trial judge that the accident and injury did occur as alleged by the plaintiff. ' ,,v - ' r :v-'-5 --.l*1’
It appears that notice of the accident was given by Mrs. Hinyup to Lawrence S. Frey, an executive of' defendant ‘corporation, on August 6th, 7th dr ¿th as Mn Frey admitted he had talked to her' on one of those dates and had given,her a claims;form,to be completed. (Tr. 198)
It further” appears''that the plaintiff’s expjppation^of ,thp accidpqL.has been amply corroborated by, surrounding, .circumstances, as shown by the record. Zito v. Standard Accident Insurance Company, 76 Sd.2d 25, Court of Appeal, 1st. Circuit, 1954.
*518 The trial court after hearing and weighing the evidence found for the plaintiff and awarded her $35.00 per week for 100 weeks, however, we feel that the plaintiff has suffered a total permanent disability and that the judgment should be amended by increasing the period to 400 weeks from August 6, 1958, with interest at 5 per centum per annum from due date of each installment until paid.
That because of the loss of the first accident report and the second report having not been made until September, 1958, the court feels that penalties and attorney’s fees should not be allowed as set out by the trial court.
For. the reasons assigned, the judgment appealed is amended by increasing the amount of the award to $35 per week during disability for a period of not exceeding 400, weeks commencing on August 6, 1958.
■ As amended herein the said judgment is affirmed with all costs of this appeal assessed against the defendants.
Amended and affirmed.